UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

RHONDA PLOURDE,                )
                               )
         Plaintiff             )
                               )
v.                             )    No. 1:12-cv-194-JAW
                               )
                               )
CAROLYN W. COLVIN,             )
Acting Commissioner of Social Security,[1] )
                               )
         Defendant             )

REPORT AND RECOMMENDED DECISION[2]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI") appeal raises the question of whether the administrative law judge supportably found the plaintiff capable of performing work existing in significant numbers in the national economy. The plaintiff seeks reversal and remand on one basis: that the administrative law judge wrongly deemed her mental impairments nonsevere, an error that she argues was not harmless. *See* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (ECF No. 10) at 3-11. I agree. Accordingly, I recommend that the court vacate the decision and remand this case for further proceedings consistent herewith.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. §§ 404.1520, 416.920; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is substituted as the defendant in this matter.
[2] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on March 12, 2013, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

administrative law judge found, in relevant part, that the plaintiff met the insured status requirements of the Social Security Act through September 30, 2010, Finding 1, Record at 15; that she had severe impairments of left shoulder adhesive capsulitis, early mild degenerative disc disease without neurological or physical findings, and minor wedging of T11 and compression fractures of other thoracic segments, Finding 3, *id*. at 16; that she retained the residual functional capacity ("RFC") to lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about six hours in a workday, sit for about six hours in a workday, occasionally push and/or pull up to 10 pounds with her left upper extremity, with no corresponding limitation of her right upper extremity, never climb ladders, ropes, or scaffolds or crawl, occasionally climb stairs or ramps, balance, stoop, crouch, or kneel, avoid overhead work with her left upper extremity, occasionally handle with her left upper extremity, and avoid vibrating tools, unprotected heights, and machinery requiring good bimanual dexterity, Finding 5, *id*. at 21; that, considering her age (44 years old, defined as a younger individual, on her alleged disability onset date), education (at least high school), work experience (transferability of job skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that she could perform, Findings 7-10, *id*. at 30-31; and that she, therefore, was not disabled from September 22, 2008, her alleged disability onset date, through September 20, 2011, the date of the decision, Finding 11, *id*. at 32.[3] The Appeals Council declined to review the decision, *id*. at 1-3, making the

---

[3] Although, for purposes of the plaintiff's application for SSD benefits, she was required to demonstrate that she was disabled on or before her date last insured, September 30, 2010, her condition through the date of the decision was relevant for purposes of SSI benefits, which are not tied to a claimant's date last insured. *See Splude v. Apfel*, 165 F.3d 85, 87 (1st Cir. 1999) ("In 1972, Congress added a new social security program to provide 'supplemental security income' (called 'SSI') for 'aged, blind and disabled' persons of limited means regardless of their insured status. This is a social welfare program funded out of general taxpayer revenues. SSI is available even to those who qualify for SSD, but SSD income is considered in determining whether a disabled person qualifies for SSI under the latter's means test.") (citations omitted); *Chute v. Apfel*, No. 98-417-P-C, 1999 WL 33117135, at *1 n.2 (D. Me. Nov. 22, 1999) ("To be eligible to receive SSD benefits the plaintiff had to have been disabled on or before her date last insured (March 31, 1995); however, eligibility for SSI benefits is not dependent on insured status.").

decision the final determination of the commissioner, 20 C.F.R. §§ 404.981, 416.1481; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).  In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn.  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than her past relevant work.  20 C.F.R. §§ 404.1520(g), 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7.  The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work.  *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

The plaintiff's statement of errors also implicates Step 2 of the sequential evaluation process.  Although a claimant bears the burden of proof at Step 2, it is a *de minimis* burden, designed to do no more than screen out groundless claims.  *McDonald v. Secretary of Health & Human Servs*., 795 F.2d 1118, 1124 (1st Cir. 1986).  When a claimant produces evidence of an impairment, the commissioner may make a determination of non-disability at Step 2 only when the medical evidence "establishes only a slight abnormality or [a] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work

3

even if the individual's age, education, or work experience were specifically considered." *Id.* (quoting Social Security Ruling 85-28).

## I. Discussion

In the absence of reliance on an expert's opinion, an administrative law judge, as a layperson, may make a finding of nonseverity at Step 2 only to the extent that such a judgment can be made as a matter of common sense. *See, e.g., Gordils v. Secretary of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) (Although an administrative law judge is not precluded from "rendering common-sense judgments about functional capacity based on medical findings," he "is not qualified to assess residual functional capacity based on a bare medical record."); *Stanwood v. Bowen*, 643 F. Supp. 990, 991 (D. Me. 1986) ("Medical factors alone may be used only to screen out applicants whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled from gainful employment. . . . [A]n impairment is to be found not severe only if it has such a minimal effect on the individual's ability to do basic work activities that it would not be expected to interfere with his ability to do most work.") (citations and internal quotation marks omitted).

The record in this case contains seven expert opinions on the severity of the plaintiff's mental health impairments. In a Psychiatric Review Technique Form ("PRTF") dated April 15, 2009, Disability Determination Services ("DDS") nonexamining consultant Lewis F. Lester, Ph.D., found that the plaintiff did not have a medically determinable mental impairment. *See id.* at 485. He noted that he had spoken to the plaintiff by telephone regarding a comment on her Adult Function Form, "Depression and fear of losing everything I have[,]" and she had stated that "the depression is not affecting her social activities or daily activities[,]" that she "has never been hospitalized for any mental health problems and it does not affect her relationships." *Id.* at

4

497. He added: "She said it is just depressing dealing with the physical problems she has but symptoms are not disabling at all." *Id*. at 497.

In a PRTF dated November 12, 2009, DDS nonexamining consultant Brenda Sawyer, Ph.D., also found that the plaintiff had no medically determinable mental impairment. *See id*. at 610.

On January 6, 2010, medical consultant Eugene Fierman, M.D., expressed disagreement with Dr. Sawyer's PRTF on the basis that Dr. Sawyer had insufficient evidence to make that determination. *See id*. at 633-34. He noted, *inter alia*, that "[i]n a note by TP [treating physician] Dr. Lanoy dated 11/5/2009, [the plaintiff] is described as having symptoms consist[e]nt with depression, was encouraged to continue Elavil and was referred for counseling." *Id*. at 638. He concluded, "[t]here is a clear suggestion of a mental impairment which must be developed[.]" *Id*.

The DDS referred the plaintiff to Donna M. Gates, Ph.D., for a clinical interview, mental status examination, intellectual testing, and diagnosis. *See id*. at 639. Based on an examination conducted on February 18, 2010, Dr. Gates concluded that, although the plaintiff had "some adjustment reaction features involving anxiety and depression[,]" she "presented with no clinically significant mental health limitations." *Id*. at 642. Dr. Gates assessed the plaintiff with a Global Assessment of Functioning ("GAF") score of 70, indicating mild impairment. *See id*. at 643.[4]

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) ("DSM–IV–TR"), at 32. The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. A GAF score of 61 to 70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g.,
(*continued on next page*)

With the benefit of Dr. Gates' report, a third DDS nonexamining consultant, Thomas Knox, Ph.D., found in a PRTF dated March 4, 2010, that the plaintiff's mental impairments were currently nonsevere, imposing only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in concentration, persistence, or pace, with no episodes of decompensation, each of extended duration. *See id*. at 655, 657; *see also, e.g.*, 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is non-severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities[.]").

However, Dr. Knox stated that there was insufficient evidence to assess the severity of her mental impairments as of her date last insured, *see id*. at 657, which at that time was calculated as September 30, 2009, *see id*. at 645. The plaintiff's date last insured subsequently was recalculated as September 30, 2010. *See* Finding 1, *id*. at 15; *see also id*. at 76-77. Thus, Dr. Knox's current findings are valid for the corrected date last insured, as well.

On or about March 8, 2010, Dr. Fierman reviewed the Knox PRTF and stated that he agreed with it, commenting, "The evidence is now sufficient. The assessment is a matter of judgment and is supported by the available evidence." *Id*. 659-60.

Finally, a treating source, B. Thom Hieronymus, ARNP, completed a medical source statement of ability to do work-related activities (mental) dated April 14, 2011, in which he checked a box indicating that the plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances was markedly limited

---

occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV–TR at 34 (boldface omitted).

or effectively precluded by her symptoms (including chronic pain), disorders, the effects of her medications, or any combination of those items.  *See id*. at 906-07.

The administrative law judge gave no weight to the Hieronymus opinion, noting that Hieronymus had not explained the opinion or defined "markedly limited" and that the opinion was unsupported by the record as a whole or Heironymus's own records in particular.  *See id*. at 19.  He adopted Dr. Knox's findings, which he noted were endorsed by Dr. Fierman.  *See id*.  In so doing, he acknowledged that, in August 2010, subsequent to the Knox and Fierman opinions, the plaintiff was hospitalized for a suicide attempt and received post-hospitalization treatment for her mental impairments.  *See id*. at 18-19.  However, he found that the new evidence did not warrant more restrictive severity findings than those of Dr. Knox.  *See id*. at 19.

No agency expert examined the plaintiff following her suicide attempt or examined the records generated during or subsequent to that attempt, and no psychological or psychiatric expert was called to testify at her hearing.  *See id*. at 39, 66.  The administrative law judge rejected the only opinion issued after the plaintiff's suicide attempt, that of treating source Hieronymus.  Thus, the question presented is whether, in these circumstances, the administrative law judge's assessment that the plaintiff's mental impairments remained nonsevere in the wake of her suicide attempt is supported by substantial evidence.  I conclude that it is not.

The administrative law judge explained that, in his view, the plaintiff's August 2010 hospitalization was not an episode of decompensation of extended duration (*i.e*., lasting for at least two weeks) because:

7

1.      She was hospitalized for about nine days at Redington-Fairview General Hospital ("Redington-Fairview") and Acadia Hospital. *See id*. at 18.[5] On August 18, 2010, two days before her discharge, she denied that she intended to kill herself, and on August 20, 2010, the day of her discharge, she described her mood as "perfect" and said she felt much better prepared to deal with the stressors that she was facing. *Id*.

2.      At a September 13, 2010, medication check, her mental status examination was unremarkable, she reported that her anxiety was resolved and that her depression had improved on her medications, and she denied any thoughts of wanting to hurt herself. *See id*. This single post-hospitalization mental medication follow-up was the only specialized mental health care she received until she enrolled in the Kennebec Behavioral Health Center ("Kennebec") for counseling in March 2011. *See id*.

3.      Even assuming, *arguendo*, that the hospitalization was part of an episode of decompensation of extended duration, the plaintiff did not have a severe mental impairment. *See id*. The administrative law judge reasoned that (i) "[t]his was an isolated incident in her health care that was not part of a pattern[,]" *id*. at 18-19, (ii) "[m]edical intervention was quick to restore [her] mental functioning to baseline[,]" *id*. at 19, and (iii) "[t]he 12-month duration requirement, needed to show a severe mental impairment, could not be established by this single episode[,]" *id*.

Elsewhere in his opinion, the administrative law judge also remarked that:

1.      There was little mention of the plaintiff's psychological history after August 2010 in the records of Hieronymus, her primary care provider, who did not provide psychiatric care,

---

[5] The administrative law judge mistakenly referred to Redington-Fairview as "Redington-General Hospital." *Compare* Record at 18 *with id*. at 843.

and the records of a brief period of treatment at Kennebec show that she was not examined or diagnosed by a doctoral-level provider. *See id*. at 17.

    2.    He did not find credible the plaintiff's testimony that she had panic attacks and stayed in bed all day due to depression. *See id*. at 19. In his view, this testimony was not supported by subjective or objective evidence in the medical records; for instance, panic disorders were not a significant part of the symptomatology that she had relayed to her providers. *See id*.

Nonetheless, as the plaintiff argues, there are indications that both during and after her hospitalization, she suffered functional limitations that could be expected to have more than a minimal effect on her ability to work. The first responders who transported her to Redington-Fairview on August 11, 2010, noted that they had been called for a female who may have overdosed and was "out of control[,]" with her husband reporting that he awoke to find her "destroying the house[.]" *Id*. at 863 (internal quotation marks omitted). They found her "naked, on the floor, covered in feces, combative and fighting with police." *Id*. The plaintiff, who had abused alcohol and overdosed on two prescription medications, baclofen and tramadol, was hospitalized at Redington-Fairview for five days, initially on a ventilator following respiratory failure. *See id*. at 882-84. Upon her admission to Acadia Hospital for inpatient mental health treatment on August 17, 2010, she was assessed with a GAF score of 20, *see id*. at 695, reflecting "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal person hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)[,]" DSM-IV-TR at 34 (boldface omitted).

The plaintiff was discharged from Acadia Hospital on August 20, 2010, with diagnoses of, *inter alia*, depressive disorder, not otherwise specified, anxiety disorder, not otherwise specified, adjustment disorder, and alcohol abuse. *See* Record at 669. While, as the administrative law judge pointed out, she stated that "she felt that she was much better prepared to deal with the stressors she was facing[,]" *id*. at 670, she was assessed with a GAF score of 50, *see id*. at 669, which represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)[,]" DSM-IV-TR at 34 (boldface omitted).

Finally, while it is true that there was a gap in the plaintiff's specialized mental health treatment from September 13, 2010, when she had a follow-up medication management appointment at Acadia Hospital, *see* Record at 667-68, to March 8, 2011, when she initiated counseling treatment at Kennebec, *see id*. at 934-35, she testified that she had to wait a month and a half to obtain her initial appointment at Kennebec, *see id*. at 104, and she was assessed on intake and at all subsequent Kennebec visits for which progress notes are available with a GAF score of 45, *see id*. at 908-35, again indicative of serious symptoms, *see* DSM-IV-TR at 34. In addition, during a psychiatric evaluation performed at Kennebec on May 12, 2011, she endorsed depressive symptoms such as increased appetite, anhedonia, decreased energy, disrupted sleep, and difficulty concentrating, *see* Record at 916, and she was noted on mental status examination to have a depressed mood and a constricted affect, *see id*. at 921.[6]

---

[6] In finding the plaintiff's mental impairments nonsevere in the wake of her suicide attempt, the administrative law judge made little mention of the Kennebec records, stating that (i) "[t]he records from the brief period of treatment at Kennebec Behavioral Health show that [the plaintiff] was not examined or diagnosed by a doctoral-level provider[,]" Record at 17, and (ii) "[a] review of KBHC's notes do not persuade the undersigned that there was an episode of decompensation that motivated her to enroll for those services[,]" *id*. at 18. The plaintiff was treated at Kennebec by a nurse practitioner and a counselor. *See id*. at 908-35. While evidence from such providers cannot be used to establish a medically determinable impairment, it may be used to assess the severity of an impairment, *see*
(*continued on next page*)

In these circumstances, it cannot fairly be said that the record makes it clear to a layperson as a matter of common sense that, following the plaintiff's suicide attempt, she was restored to her baseline state, as reflected in Dr. Gates' February 2010 assessment of a GAF score of 70, indicative of mild symptoms.[7]  Nor can it fairly be said that her mental impairments did not meet the so-called duration requirement, which provides that, "[u]nless [a claimant's] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. §§ 404.1509, 416.909.  The plaintiff was diagnosed by Dr. Gates in February 2010 with adjustment reaction with mixed depression and anxiety features.  *See* Record at 643.  In August 2010, following her suicide attempt, she was diagnosed by Jennifer B. Lothian, M.D., of Acadia Hospital with, *inter alia*, depressive disorder, anxiety disorder, and adjustment disorder.  *See id*. at 669.  She was still undergoing treatment for those disorders as of the time of her hearing before the administrative law judge on June 9, 2011.  *See id*. at 106.  For these reasons, the administrative law judge's finding that the plaintiff's mental impairments were nonsevere is unsupported by substantial evidence.

As the plaintiff acknowledges, *see* Statement of Errors at 10, "an error at Step 2 is uniformly considered harmless, and thus not to require remand, unless the plaintiff can

---

20 C.F.R. §§ 404.1513(a) & (d), 416.913(a) & (d), and it seemingly would be relevant to an expert consultant in reviewing the record to assess the severity of her impairments in the wake of her suicide attempt.

[7] At oral argument, counsel for the commissioner cited *Anderson v. Astrue*, No. 1:11-cv-476-DBH, 2012 WL 5256294 (D. Me. Sept. 27, 2012) (rec. dec., *aff'd* Oct. 23, 2012), for the proposition that this court has held that it is within an administrative law judge's discretion to evaluate evidence submitted subsequent to a nonexamining consultant's written report to determine whether it is consistent or cumulative, and *Pepin v. Astrue*, Civil No. 09-464-P-S, 2010 WL 3361841 (D. Me. Aug. 24, 2010) (rec. dec., *aff'd* Sept. 16, 2010), for the proposition that "a [GAF] score of 49 *could* be consistent with an inability to work, but it is not *necessarily* so[,]" *Pepin*, 2010 WL 3361841, at *8 (emphasis in original).  In *Anderson*, the court held that an administrative law judge did not exceed the bounds of his competence as a layperson in determining that the raw medical evidence postdating DDS nonexamining consultants' reports was essentially cumulative and, therefore, did not call into question their conclusions regarding the severity of the plaintiff's mental health limitations.  *See Anderson*, 2012 WL 5256294, at *4.  Here, however, the administrative law judge did not deem the new evidence cumulative.  Rather, he judged the plaintiff's suicide attempt to have been an isolated incident.  The fact that, at all times following her suicide attempt, the plaintiff was assessed GAF scores that *could* be suggestive of disability underscored the need for expert assistance on the question of whether her mental impairments remained nonsevere.

demonstrate how the error would necessarily change the outcome of the plaintiff's claim[,]" *Bolduc v. Astrue,* Civil No. 09–220–B–W, 2010 WL 276280, at * 4 n .3 (D. Me. Jan. 19, 2010).

Nonetheless, as the plaintiff points out, *see* Statement of Errors at 10, this court has made an exception to that rule in circumstances in which the evidence of record "essentially suppl[ies] the missing information[,]" *Brackett v. Astrue*, No. 2:10-cv-24-DBH, 2010 WL 5467254, at *7 (D. Me. Dec. 29, 2010) (rec. dec., *aff'd* Jan. 19, 2011). The exception was applied in *Brackett* when, although the claimant did not demonstrate how a Step 2 error would necessarily affect the outcome of her case, *see id*. at *6, and her treating psychiatrist "did not directly address the impact of the [claimant's] mental impairments on occupational functioning, [the treating psychiatrist] assessed a GAF score that is consistent with serious occupational impairment[,]" *id*. at *7. The court concluded that, "while the question is a close one, the existence of this evidence is enough to meet the plaintiff's Step 2 burden." *Id*. (citation and internal punctuation omitted).

The GAF score at issue in *Brackett* was 48, *see id*. at *3, which is indicative of the same symptoms as the GAF scores of 45 and 50 at issue in this case, *see* DSM –IV-TR at 34. There is, thus, no material distinction between *Brackett* and this case. The plaintiff having shown that the Step 2 finding that she had no severe mental impairment is unsupported by substantial evidence and that the error is not harmless, reversal and remand are warranted for proper assessment of the severity of the plaintiff's mental impairments and continuation of the sequential evaluation process, should those impairments be determined to have been severe prior to the plaintiff's date last insured and/or currently.[8]

---

[8] The plaintiff also argues that the Step 2 error was not harmless because the vocational expert testified on cross-examination that limitations similar to that found by Hieronymus would preclude employment. *See* Statement of Errors at 11. However, the plaintiff does not challenge the administrative law judge's rejection of the Hieronymus (*continued on next page*)

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **VACATED** and the case **REMANDED** for the proceedings not inconsistent herewith.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 14th day of March, 2013.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

---

mental RFC opinion.  *See generally id*.   Accordingly, she cannot rely on vocational testimony incorporating limitations similar to that found by Hieronymus to demonstrate harm.